No. 23-2165

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

————————

MR. DEE'S INC., on behalf of themselves and all others similarly situated; RETAIL MARKETING SERVICES, INC., on behalf of themselves and all others similarly situated; CONNECTICUT FOOD ASSOCIATION, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants*,

v.

INMAR, INC.; CAROLINA MANUFACTURER'S SERVICES, INC.; CAROLINA SERVICES; CAROLINA COUPON CLEARING, INC.,

*Defendants-Appellees.*

————————

On Appeal from the United States District Court for the
Middle District of North Carolina, No. 1:19-cv-00141-WO-LPA
Hon. William L. Osteen, Jr., U.S. District Court Judge

————————

## RESPONSE BRIEF FOR APPELLEES

————————

Anne M. Voigts
KING & SPALDING LLP
601 South California Avenue
Suite 100
Palo Alto, CA 94304
(650) 422-6700

Lisa R. Bugni
Matthew V.H. Noller
KING & SPALDING LLP
50 California Street, Suite 3300
San Francisco, CA 94111
(415) 318-1200
lbugni@kslaw.com

*Counsel for Defendants-Appellees*

January 26, 2024        *(Additional counsel listed on inside cover)*

Samuel B. Hartzell
Pressly McAuley Millen
WOMBLE BOND
DICKINSON (US) LLP
555 Fayetteville Street
Suite 1100
Raleigh, NC 27601
(919) 755-2112

Mateo de la Torre
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
(212) 556-2100

*Counsel for Defendants-Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __23-2165__     Caption: __Mr. Dee's Inc. v. Inmar, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Carolina Coupon Clearing, Inc__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐ YES ☑ NO


2.     Does party/amicus have any parent corporations?     ☑ YES ☐ NO
       If yes, identify all parent corporations, including all generations of parent corporations:

       Carolina Coupon Clearing, Inc. is a wholly-owned subsidiary of Inmar, Inc.


3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐ YES ☑ NO
       If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?               ☐YES ☑NO
If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?               ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?               ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Lisa R. Bugni                              Date:        01/26/24

Counsel for: Carolina Coupon Clearing, Inc.

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>23-2165</u>      Caption: <u>Mr. Dee's Inc. v. Inmar, Inc.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Carolina Manufacturer's Services, Inc.</u>
(name of party/amicus)

who is <u>appellee</u>, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?                ☑ YES ☐ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

    Carolina Manufacturer's Services, Inc. is a wholly-owned subsidiary of Inmar, Inc.

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                ☐ YES ☑ NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Lisa R. Bugni                    Date:    01/26/24

Counsel for: Carolina Manufacturer's Services, In

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __23-2165__        Caption: __Mr. Dee's Inc. v. Inmar, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Carolina Services__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO


2.  Does party/amicus have any parent corporations?                    ☑ YES ☐ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

    Carolina Services is a wholly-owned division of Inmar, Inc.


3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                  ☐ YES ☑ NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Lisa R. Bugni                          Date: _____01/26/24_____

Counsel for: Carolina Services

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. <u>23-2165</u>      Caption: <u>Mr. Dee's Inc. v. Inmar, Inc.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Inmar, Inc.</u>
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                    ☑YES ☐NO
       If yes, identify all parent corporations, including all generations of parent corporations:

        Inmar, Inc. is a wholly-owned subsidiary of OPE Inmar Holdings, Inc.


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                    ☐YES ☑NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Lisa R. Bugni                    Date:        01/26/24

Counsel for: Inmar, Inc.

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT..............................................i

TABLE OF AUTHORITIES.....................................................................iv

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ..........................................................3

STATEMENT OF ISSUES.......................................................................3

STATEMENT OF THE CASE ..................................................................4

    A.    Factual Background...................................................................4

        1.    The Coupon Processing Industry ...................................4

        2.    Shipping Fees Charged to Manufacturers.....................6

        3.    The Alleged Antitrust Conspiracy .................................8

    B.    Procedural Background ...........................................................10

        1.    Shifting Parties and Claims .........................................10

        2.    Plaintiffs' Expert's Shifting Theories of Liability and Damages.................................................12

        3.    Plaintiffs' Shifting Class Definitions ...........................17

            a.    The Court Denies Plaintiffs' First Proposed Class Definitions.................................17

            b.    Plaintiffs Propose More Class Definitions and the Court Certifies a Retailer Class but Not a Manufacturer One ...................................20

                (a)    The Rejected Limited Payer Classes .........21

                (b)    The Rejected All Payer Manufacturer and Fixed List Classes and Certified Retailer Class ...........................................22

SUMMARY OF ARGUMENT ................................................... 23

STANDARD OF REVIEW ..................................................... 25

ARGUMENT .................................................................. 26

I.    No Manufacturer Class Can Be Certified Because Individual Issues Predominate ........................................ 26

II.   The District Court Did Not Abuse Its Discretion by Declining to Certify Plaintiffs' Fail-Safe Fixed List Class ........... 32

    A.    Rule 23 Prohibits Certifying Fail-Safe Classes .................... 33

    B.    The Fixed List Class Is Impermissibly Fail-Safe Because Membership Is Conditioned on Having Suffered Antitrust Injury ........................................ 38

III.  The District Court Did Not Abuse Its Discretion by Denying Certification of the Limited Payer Class ........................ 45

    A.    The Limited Payer Class Is Not Ascertainable Based on Objective Criteria ............................................ 46

    B.    The Limited Payer Class Is Not Superior to Other Methods of Adjudication ....................................... 54

IV.  The District Court Did Not Abuse Its Discretion by Declining to Certify Plaintiffs' All Payer Class ............................ 58

    A.    The District Court Did Not Clearly Err as to the Number of Uninjured Class Members ................................. 61

    B.    The District Court Applied the Correct Legal Standard ..................................................... 64

    C.    Individualized Issues Predominate. ........................... 64

V.   This Court Should Decline Plaintiffs' Invitation to Do Their Job for Them ..................................................... 65

CONCLUSION .............................................................. 65

LOCAL RULE 34(a) STATEMENT ........................................................66

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Abdeljalil v. Gen. Elec. Cap. Corp.*,
  306 F.R.D. 303 (S.D. Cal. 2015)............................................................58

*Adair v. EQT Prod. Co.*,
  320 F.R.D. 379 (W.D. Va. 2017) ...........................................................41

*Adashunas v. Negley*,
  626 F.2d 600 (7th Cir. 1980)..................................................................34

*Alig v. Rocket Mortg., LLC*,
  52 F.4th 167 (4th Cir. 2022) ..................................................................59

*All. to End Repression v. Rochford*,
  565 F.2d 975 (7th Cir. 1977)..................................................................48

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................................26

*Bennett v. GoDaddy.com LLC*,
  2019 WL 1552911 (D. Ariz. Apr. 8, 2019) ...........................................52

*Benson v. Enter. Leasing Co. of Orlando, LLC*,
  2021 WL 2138781 (M.D. Fla. May 11, 2021) .......................................44

*Bertulli v. Indep. Ass'n of Cont'l Pilots*,
  242 F.3d 290 (5th Cir. 2001)..................................................................53

*Blades v. Monsanto Co.*,
  400 F.3d 562 (8th Cir. 2005)..................................................................31

*Boggs v. Divested Atomic Corp.*,
  141 F.R.D. 58 (S.D. Ohio 1991) ............................................................57

*Brockman v. Barton Brands, Ltd.*,
  2007 WL 4162920 (W.D. Ky. Nov. 21, 2007)...................................50, 51

*Brooks v. Darling Int'l, Inc.*,
  2017 WL 1198542 (E.D. Cal. Mar. 31, 2017) ...................................50, 51

iv

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
    155 F.3d 331 (4th Cir. 1998)................................................................31

*Butela v. Midland Credit Mgmt. Inc.*,
    341 F.R.D. 581 (W.D. Pa. 2022)........................................................44

*Byrd v. Aaron's Inc.*,
    784 F.3d 154 (3d Cir.), *as amended* (Apr. 28, 2015)..............33, 48, 52

*Campos v. W. Dental Servs., Inc.*,
    404 F. Supp. 2d 1164 (N.D. Cal. Nov. 28, 2005)....................55, 56, 57

*Career Counseling, Inc. v. Amerifactors Fin. Grp., LLC*,
    __ F.4th __, 2024 WL 220377 (4th Cir. Jan. 22, 2024)................25, 48

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)........................................................................40, 47

*Cordoba v. DIRECTV, LLC*,
    942 F.3d 1259 (11th Cir. 2019)..........................................................33

*Daigle v. Shell Oil Co.*,
    133 F.R.D. 600 (D. Colo. 1990) ....................................................50, 51

*Dennis v. Saks & Co.*,
    1975 WL 909 (S.D.N.Y. July 10, 1975) ..............................................58

*Elsea v. Jackson Cnty.*,
    2010 WL 4386538 (W.D. Mo. Oct. 28, 2010) ................................50, 51

*EQT Prod. Co. v. Adair*,
    764 F.3d 347 (4th Cir. 2014)......................................................*passim*

*Fariasantos v. Rosenberg & Assocs., LLC*,
    303 F.R.D. 272 (E.D. Va. 2014) .............................................21, 55, 56

*Franco v. Conn. Gen. Life Ins. Co.*,
    289 F.R.D. 121 (D.N.J. 2013)............................................................48

*Gbarabe v. Chevron Corp.*,
    2017 WL 956628 (N.D. Cal. Mar. 13, 2017)..................................50, 51

*Geary v. Green Tree Servicing, LLC,*
  2017 WL 2608691 (S.D. Ohio June 16, 2017) .................................... 44

*Groussman v. Motorola, Inc.,*
  2011 WL 5554030 (N.D. Ill. Nov. 1, 2011) ................................... 47, 51

*Guevarra v. Progressive Fin. Servs., Inc.,*
  497 F. Supp. 2d 1090 (N.D. Cal. 2007) ........................................ 55, 57

*Gunnels v. Healthplan Servs., Inc.,*
  348 F.3d 417 (4th Cir. 2003) .............................................................. 25

*Halliburton Co. v. Erica P. John Fund, Inc.,*
  573 U.S. 258 (2014) ............................................................................ 65

*Hammond v. Powell,*
  462 F.2d 1053 (4th Cir. 1972) ........................................................... 47

*Henderson v. Corelogic Nat'l Background Data, LLC,*
  2016 WL 4611570 (E.D. Va. Sept. 2, 2016) ...................................... 58

*Henderson v. Corelogic Nat'l Background Data, LLC,*
  2016 WL 4611571 (E.D. Va. Sept. 2, 2016) ...................................... 58

*In re Asacol Antitrust Litig.,*
  907 F.3d 42 (1st Cir. 2018) ................................................................ 30

*In re HomeBanc Mortg. Corp.,*
  945 F.3d 801 (3d Cir. 2019) ............................................................... 43

*In re Hydrogen Peroxide Antitrust Litig.,*
  552 F.3d 305 (3d Cir.), *as amended* (Jan. 16, 2009) .............. 26, 31, 61

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.,*
  341 F.R.D. 128 (D. Md. 2022) ............................................................ 57

*In re New Motor Vehicles Can. Exp. Antitrust Litig.,*
  522 F.3d 6 (1st Cir. 2008) .................................................................. 30

*In re Nexium Antitrust Litig.,*
  777 F.3d 9 (1st Cir. 2015) ............................................................ 33, 36

*In re Polyester Staple Antitrust Litig.*,
　　2007 WL 2111380 (W.D.N.C. July 19, 2007) ..................................... 62

*In re Rail Freight Fuel Surcharge Antitrust Litig.* (*In re Rail
　　Freight II*),
　　934 F.3d 619 (D.C. Cir. 2019) ................................................. 23, 30, 64

*In re Rodriguez*,
　　695 F.3d 360 (5th Cir. 2012) ............................................................. 33

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*,
　　2018 WL 11303199 (D.S.C. June 20, 2018) ...................................... 44

*In re Titanium Dioxide Antitrust Litig.*,
　　284 F.R.D. 328 (D. Md. 2012) ............................................................ 51

*In re White*,
　　64 F.4th 302 (D.C. Cir. 2023) ........................................................... 33

*In re Zetia (Ezetimibe) Antitrust Litig.*,
　　7 F.4th 227 (4th Cir. 2021) ............................................................... 61

*In re Zetia (Ezetimibe) Antitrust Litig.*,
　　2021 WL 3704727 (E.D. Va. Aug. 20, 2021)...................................... 58

*Jiminez v. Mary Wash. Coll.*,
　　57 F.3d 369 (4th Cir. 1995) .............................................................. 25

*Johnson v. City of Grants Pass*,
　　72 F.4th 868 (9th Cir.),
　　*as amended on denial of reh'g* (July 5, 2023) ..................................... 43

*Kamar v. RadioShack Corp.*,
　　375 F. App'x 734 (9th Cir. 2010) ...................................................... 43

*Krakauer v. Dish Network, LLC*,
　　925 F.3d 643 (4th Cir. 2019)................................................... 18, 46, 48

*Lester v. Pay Car Mining, Inc.*,
　　2018 WL 2728033 (S.D.W. Va. June 6, 2018).............................. 42, 44

*Lienhart v. Dryvit Sys., Inc.*,
    255 F.3d 138 (4th Cir. 2001).........................................................31, 54

*Mace v. Van Rue Credit Corp.*,
    109 F.3d 338 (7th Cir. 1997).................................................................53

*Marcus v. BMW of N. Am., LLC*,
    687 F.3d 583 (3d Cir. 2012) ..................................................................47

*McKeage v. Bass Pro Outdoor World, L.L.C.*,
    2014 WL 12754996 (W.D. Mo. Oct. 7, 2014) .................................41, 42

*Messner v. Northshore Univ. HealthSys.*,
    669 F.3d 802 (7th Cir. 2012).................................................................35

*Mullins v. Direct Digit., LLC*,
    795 F.3d 654 (7th Cir. 2015).............................................33, 34, 36, 37

*Novell, Inc. v. Microsoft Corp.*,
    505 F.3d 302 (4th Cir. 2007).................................................................61

*Nutraceutical Corp. v. Lambert*,
    139 S. Ct. 710 (2019) .............................................................................3

*O'Connor v. Boeing N. Am., Inc.*,
    184 F.R.D. 311 (C.D. Cal. 1998) ..........................................................48

*Olean Wholesale Grocery Coop., Inc.
    v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) .............................................23, 33, 45, 65

*Orduno v. Pietrzak*,
    932 F.3d 710 (8th Cir. 2019)........................................................*passim*

*Ostrzenski v. Seigel*,
    177 F.3d 245 (4th Cir. 1999).................................................................27

*Parish v. Sheriff of Cook Cnty.*,
    2016 WL 1270400 (N.D. Ill. Mar. 31, 2016).........................................44

*Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n*,
    814 F.2d 358 (7th Cir. 1987).................................................................35

*Randleman v. Fid. Nat'l Title Ins. Co.,*
646 F.3d 347 (6th Cir. 2011)................................................................33

*Rivera v. Exeter Fin. Corp.,*
829 F. App'x 887 (10th Cir. 2020) ..........................................*passim*

*Robinson v. Tex. Auto. Dealers Ass'n,*
387 F.3d 416 (5th Cir. 2004)................................................................31

*Roman v. ESB, Inc.,*
550 F.2d 1343 (4th Cir. 1976)..............................................................25

*Schwartz v. Destination Maternity Corp.,*
2015 WL 13648569 (C.D. Cal. May 18, 2015)..............................50, 52

*Simer v. Rios,*
661 F.2d 655 (7th Cir. 1981)................................................................49

*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016), *as revised* (May 24, 2016)............................59, 60

*Thorn v. Jefferson-Pilot Life Ins. Co.,*
445 F.3d 311 (4th Cir. 2006)................................................................25

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021)..............................................................................59

*Tyson Foods, Inc. v. Bouaphakeo,*
577 U.S. 442 (2016)..............................................................................59

*United States v. Balsiger,*
910 F.3d 942 (7th Cir. 2018)..................................................................9

*United States v. Smith,*
395 F.3d 516 (4th Cir. 2005)................................................................27

*Vaughn v. CSC Credit Servs., Inc.,*
1994 WL 449247 (N.D. Ill. Mar. 1, 1994)............................................53

*Vaughn v. CSC Credit Servs., Inc.,*
1995 WL 51402 (N.D. Ill. Feb. 3, 1995)................................................53

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338 (2011) ....................................................................39, 47

*Walton v. Johnson,*
  440 F.3d 160 (4th Cir. 2006) .............................................................25

*Wenig v. Messerli & Kramer P.A.,*
  2013 WL 1176062 (D. Minn. Mar. 21, 2013).....................53, 54, 55, 56

*Windham v. Am. Brands, Inc.,*
  565 F.2d 59 (4th Cir. 1977) .......................................................*passim*

*Young v. Nationwide Mut. Ins. Co.,*
  693 F.3d 532 (6th Cir. 2012) ........................................................18, 34

*Zimmerman v. Bell,*
  800 F.2d 386 (4th Cir. 1986) .............................................................25

## Rules

Fed. R. Civ. P. 23 ...........................................................................*passim*

## Other Authorities

1 McLaughlin on Class Actions § 4:2 (20th ed.) .............................*passim*

1 Newberg on Class Actions § 3:2 (6th ed.) ............................................46

Manual Complex Litigation § 21.222 (4th ed.)..................................52, 55

## INTRODUCTION

The only constant about this case is its fundamental unsuitability for class certification. Virtually everything else has changed in the fifteen years since the first complaint was filed in 2008—including who the plaintiffs are, what their theories of harm focus on, and how they define the putative classes. Throughout all those iterations, however, one thing has remained true: this case—or at least the proposed manufacturer classes—cannot be certified consistent with Federal Rule of Civil Procedure 23 or Supreme Court caselaw.

In the 15-plus years since this antitrust class action alleging price-fixing in the coupon processing industry was first filed, Plaintiffs have filed three amended complaints, brought three motions for class certification, and proposed numerous class definitions. Most recently, the district court denied summary judgment, certified a class of retailers claiming $8.8 million in damages, refused to certify any class of manufacturers, and set the case for trial. But Plaintiffs want more. Their proposed classes of manufacturers, however, (a) use fail-safe class definitions that condition class membership on having a valid claim; (b) exclude over 2,000 alleged victims based on arbitrary cutoffs unrelated

to Plaintiffs' claims; and (c) include manufacturers for 32% of whom there is no evidence of any injury.

On appeal, Plaintiffs suggest that this Court need only conclude that one of the three class definitions they currently propose is workable—and only resolve one issue as to each particular definition—for them to be entitled to class certification. And, they suggest, even if none of their definitions pass muster, this Court should simply craft its own. Not so.

The district court correctly refused to certify Plaintiffs' proposed manufacturer classes because none of them satisfy Rule 23. Indeed, even though the Supreme Court has repeatedly underscored Rule 23's requirements in cases like *Comcast Corp. v. Behrend*, *Wal-Mart Stores, Inc. v. Dukes*, and *Transunion LLC v. Ramirez*, Plaintiffs' brief does not cite any of those cases. The only Supreme Court case Plaintiffs do cite is a wholly irrelevant one addressing the Sentencing Guidelines. But ignoring controlling Supreme Court cases on class actions does not make them any less binding, or any less fatal to Plaintiffs' case for certification.

All the proposed classes suffer from a common flaw—the predominance of individual issues. But even setting that issue aside, as

the district court correctly found, none of these gerrymandered class definitions can satisfy Rule 23 or the Constitution.  This Court should affirm the district court's refusal to certify a manufacturer class.

## JURISDICTIONAL STATEMENT

Defendants largely agree with Plaintiffs' jurisdictional statement. Defendants do, however, renew their argument that to the extent Plaintiffs' Rule 23 petition raises questions about the propriety of a fail-safe class on which the district court previously ruled in denying class certification in April 2022, Plaintiff did not timely file a Rule 23(f) petition challenging that order.   Although Rule 23(f) is a non-jurisdictional claim-processing rule, it nonetheless bars consideration of untimely issues. *Nutraceutical Corp. v. Lambert*, 139 S. Ct. 710 (2019).

## STATEMENT OF ISSUES

1.    Whether this Court should affirm the denial of class certification because individual issues will inevitably predominate in any manufacturer class.

2.    Whether the district court abused its discretion in concluding that Plaintiffs' proposed Fixed List Class could not be squared with Rule 23 in part because it was an impermissible fail-safe class.

3.     Whether the district court abused its discretion by declining to certify the proposed Limited Payer Class because it arbitrarily excluded over 2,000 purportedly injured manufacturers.

4.     Whether the district court abused its discretion by declining to certify the proposed All Payer Class because 32% of its members suffered no injury at all and Plaintiffs cannot satisfy Rule 23's predominance requirement.

## STATEMENT OF THE CASE

### A.     Factual Background

#### 1.     The Coupon Processing Industry

This lawsuit arises out of the coupon processing industry as it existed when manufacturers, retailers, and consumers still used paper coupons.  During that period, despite paper coupons' simplicity, the industry was surprisingly complex.  JA854.  At its simplest level, manufacturers issue coupons that consumers can redeem when purchasing the manufacturer's product from a retailer.  JA855.  When consumers do so, manufacturers then owe retailers for the discount the retailers gave the consumers.  JA854.

This is where coupon processing comes into play.  Retailers must submit redeemed coupons to the manufacturers for reimbursement, and

manufacturers need assurance their coupons were appropriately redeemed. JA854-855. Thus, retailers typically hire a retailer processor that receives all the coupons from the retailer, counts them, and invoices the manufacturer. JA856. Defendant-Appellant Inmar Inc's ("Inmar") retailer processor subsidiary was Carolina Coupon Clearing, Inc. ("CCC"), and one of CCC's primary competitors was International Outsourcing Services, Inc. ("IOS").[1] JA859-860.

Manufacturers also generally hire a manufacturer processor to count or audit the coupons received from the retailer processor, confirm the retailer processor's accounting, and pay the retailer processor accordingly. JA856. Inmar's manufacturer processor subsidiary was Carolina Manufacturer's Services, Inc. ("CMS"). JA863. (Retailers and manufacturers did not, however, have to hire a processor, and certain retailers and manufacturers processed coupons in house.)

In the standard coupon-processing system, both retailer processors and manufacturer processors counted coupons separately. JA856. This labor-intensive process usually took place in Mexico. JA856. Boxes of

---

[1]    IOS (formerly known as International Data, LLC) acted as a processor in the coupon-redemption process. Initially a defendant here, IOS was later dismissed.

coupons would be shipped to Mexico to be counted by the retailer processor and then to the manufacturer processor for a second count. JA857. Inmar handled more than two billion coupons each year. JA857.

This counting and recounting determined how much the manufacturer would be invoiced, which included (a) the coupon's face amount, (b) processing fees; and (c) shipping-and-handling fees charged to manufacturers by either the retailers themselves or the retailer processor. JA857. Naturally, manufacturers wanted to pay as little as possible as slowly as possible, while retailers wanted to be paid in full and quickly. JA856. This dynamic often resulted in manufacturers refusing to pay the amount invoiced, or assessing chargebacks to retailers to offset those amounts. JA857-858. In response, retailers would deduct some or all of those chargebacks from what they owed manufacturers for their products. JA857-858.

## 2. Shipping Fees Charged to Manufacturers

This case evolved to focus on shipping fees. Retail processors or, in some instances, retailers themselves charged manufacturers shipping fees. JA1386-1387. When retailers themselves charged shipping fees, they, not Defendants, independently decided how to set those fees.

6

JA1387.  When retail processors (here, CCC or IOS) charged fees, they had no contracts with manufacturers, and manufacturers thus had no obligation to pay those fees.  JA1387.  As a result, manufacturers took widely varying approaches: some paid the shipping fees, some paid part of them, and some paid none at all.  JA1387.  If manufacturers decided to pay less than the invoiced shipping fees (or nothing at all), the retailer processor had no recourse against them.  JA899.

Whatever manufacturers unilaterally decided to pay for shipping fees was set by their written policies.  JA1387.  For example, Kimberly-Clark, a Fortune 500 company, had a policy both before and after the alleged class period that it would pay shipping fees at $4 per thousand coupons processed.  JA1387.  It did not matter what retail processors charged Kimberly-Clark, Kimberly-Clark always paid only that amount.  JA1387.  Unsurprisingly, those policies, which were set by sophisticated manufacturers, also varied substantially.  JA678-684 (shipping policies for manufacturers including Coca-Cola, Philip Morris, and Anheuser-Busch).

In addition, CMS's agreements with some of manufacturer customers effectively capped the shipping fees they paid to CCC.  JA1387.

For example, before the alleged class period, CMS agreed with its then largest customer, Nestle, to $3.20 per-thousand coupons processed for shipping fees. JA1388.

All Plaintiffs' proposed classes at issue in this appeal include sophisticated manufacturers. No representative of any of those manufacturers has ever testified in this case. Rather, the Rule 30(b)(6) representative for the putative manufacturer representative was an attorney associated with the law firm pursuing this case. JA526, JA537.

### 3.  The Alleged Antitrust Conspiracy

Plaintiffs' antitrust case is based on a series of agreements that Inmar and IOS executed in 2001. The genesis of those agreements was the introduction of "one-count" programs to the industry in the late 1990s and early 2000s. JA859. As part of those programs, manufacturers would agree, through their manufacturer processor, to accept the data captured by the retailer processor and pay a fee for collection of that data, subject to audit rights. JA859. This generally eliminated any need for the manufacturer processor's second count, with all the attendant inconvenience, inefficiency, and expense. It also typically substantially

reduced the cycle of chargebacks and deductions between manufacturers and retailers. JA859.

Because Inmar owned both CCC and CMS, it could establish a one-count program called APEX for transactions between CCC-client retailers and CMS-client manufacturers. JA860. Inmar also had a one-count program with NCH, the largest U.S. coupon processing company, which was the retail processor for Walmart, Target, and Sears/Kmart, and the manufacturer processor for many large manufacturers. JA860. In 2000-2001, Inmar wanted to establish a one-count program with IOS, which led to the series of agreements that Inmar entered into with IOS in April 2001. JA860-862.

None of those agreements addressed the shipping fees on which Plaintiffs' alleged antitrust conspiracy turns. JA863. Nor do any other agreements support their claim.

With no actual evidence of any conspiracy, Plaintiffs' claims depend on two factual mistakes. First, they asserted that IOS's CEO Thomas Balsiger's ("Balsiger") criminal conviction for falsely invoicing unused coupons as if they had been used, was related to IOS's agreements with Inmar. Opening Brief ("OB") at 8. It was not: Balsiger's conduct had

nothing to do with IOS's agreements with Inmar. *United States v. Balsiger*, 910 F.3d 942, 946 (7th Cir. 2018). Second, Plaintiffs selectively quote Balsiger's testimony from his criminal trial that IOS's deal with Inmar "allow[ed] us to escalate our freight revenue." JA1024. But when asked about that testimony in this case, Balsiger testified that "escalate" was the "wrong word:" it was "just to get our freight revenue paid." JA1055. As Balsiger confirmed, IOS and Inmar never agreed to fix any shipping fees. JA900; JA1390 (Inmar declaration confirming there was no agreement on shipping fees).

## B. Procedural Background

### 1. Shifting Parties and Claims

This case did not begin over 15 years ago as a case about shipping fees or even a case on behalf of manufacturers. It was first brought in 2008 on behalf of a putative class of retailers only (Montana Food Distributors was the named plaintiff), who asserted that Inmar, its subsidiaries, and IOS engaged in an anticompetitive conspiracy in the coupon-processing industry. JA53-88. As originally framed, the retailers asserted a conspiracy to (a) breach fiduciary agreements and/or obligations with retailer, state association, and wholesale customers, (b) allocate customers, (c) increase the amount and type of coupon-

processing fees imposed on customers (not limited to shipping fees), and (d) defraud customers to minimize the amount customers received from manufacturers for coupons redeemed at retailers.  JA53-88.

In the next complaint, three different plaintiffs, only one of which remains in this case, alleged that the defendants (now including Supervalu) had allocated customers and shared information about chargeback methodologies.  JA89-127.

The Second Amended Complaint, filed more than ten years after the initial complaint, dropped Supervalu and focused again on retail processing fees as a whole.  JA128-171.

The Third Amended Complaint, filed in 2020, is the operative one for purposes of this appeal.  JA172-215.  That complaint dropped yet another plaintiff, leaving only two, both of whom came in after the case began.  JA172-215.  As evidenced by the class definitions Plaintiffs now advance, those Plaintiffs have whittled their case down to the claim that Defendants (now just Inmar and its subsidiaries) conspired with IOS to fix shipping fees.  *E.g.,* OB 1 (referencing shipping fees).

11

### 2. Plaintiffs' Expert's Shifting Theories of Liability and Damages

The problem for Plaintiffs is that they cannot prove even this streamlined claim. To fill the evidentiary hole at the heart of their case, Plaintiffs proffered Dr. Kathleen Grace ("Grace"). Her first report analyzed 292 manufacturers that CMS serviced before and during the alleged class period. JA1848. She found that shipping fees *decreased* for 97 of those 292 manufacturers. JA1848. Instead of accounting for those decreases in her model, though, she ignored them, using a formula based on only those manufacturers whose fees increased. JA1851.

Grace's supplemental expert report, which was designed to "assess[] impact and damages on a classwide basis," JA1710, assumed a "pre-conspiracy" and "post-conspiracy" period, the difference being when "Defendants entered the Non-Compete Agreements with IOS." JA1718, JA1719-1720. She then "conduct[ed] three separate analyses to estimate shipping fee overcharges to manufacturers," which she treated as synonymous with "damages." JA1718. From this, she composed "a list of manufacturers … that paid observably higher shipping fees after Defendants entered the Non-Compete Agreements with IOS." JA1718, JA1719.

12

Grace's analysis and the "Fixed List" it generated presumed that the Non-Compete Agreements resulted in "overcharges," *i.e.*, "damages" that would not have occurred "absent a conspiracy." JA1718, JA1719. Each list plainly assumes every putative class member suffered "damages:" Appendix A is labeled "Damages by Mftr [Manufacturer]," and lists "Damages Estimates" for each putative class member under each regression analysis. JA 1729. Appendix B is simply labeled "Damages," and assumes that each putative class member suffered "Chargeback Damages." JA1830.

The first of Grace's three analyses, the "before-during analysis," purports to "model CCC's paid shipping fee per coupon in the pre-conspiracy period, controlling for volume, and then use that relationship to forecast what a competitive shipping fee would have been absent a conspiracy." JA1719. Grace then purported to "estimate damages by subtracting the competitive shipping fee from the amount observed that manufacturers paid to CCC in shipping fees." JA1719. Grace performed a similar analysis for IOS's paid shipping fees. JA1720. That "before-during analysis" sought to conclude that manufacturers were paying supracompetitive prices, by which she arrived at "a damage estimate of

$2.4 million for the list of manufacturers identified in Appendix A." JA1721.

The second of the three analyses, the "benchmark analysis," purports to "model NCH's paid shipping fees per coupon over time, controlling for volume, and then use that relationship to forecast what a competitive shipping fee would have been absent a conspiracy." JA1721. Grace assumed that "[u]sing NCH as a benchmark controls for extraneous non-conspiratorial factors that may have affected shipping fees during the relevant time period." JA1721. She then "estimate[d] damages by subtracting the competitive shipping fee from the amounts in CCC and IOS shipping fees manufacturers paid." JA1722. Ultimately, that "yield[ed] a damage estimate of $41.7 million for the list of manufacturers identified in Appendix A." JA1723.

The third analysis, the "difference-in-differences," purports to "use NCH prices before and after the alleged conspiracy as a control to estimate what shipping fees should have been in the post-conspiracy period." JA1723. Grace first "estimate[d] the pre-conspiracy relationship between NCH's prices and CCC's prices, controlling for volume," and then, "[u]sing these estimates," "calculate[d] CCC's post-conspiracy

14

shipping fee price increases using observed post-conspiracy shipping fees." JA1724-1725. She used this analysis to "yield[] a damages estimate of $37.1 million for the list of manufacturers identified in Appendix A." JA1725. That "difference-in-differences" analysis came with two caveats: it (1) could not "be used to calculate any damages for IOS overcharges because there is no way to establish a reliable relationship between IOS's shipping fees and NCH's shipping fees," and (2) "understates damages, given that in July 2000 IOS threatened a price war if Defendants did not agree to stop competing."[2] JA1725.

Each report ignored inconvenient facts that undercut Plaintiffs' desired result. The first ignored manufacturers whose fees decreased, and the second ignored the manufacturers' varying shipping reimbursement policies and their agreements with CMS capping shipping fee charges. JA616-626. As Grace repeatedly conceded, her analysis assumed price turned on volume, not those different shipping policies or agreements providing otherwise. *E.g.,* JA477 ("The price is based on volume"); JA480 ("Once again, the only thing that matters in the data is volume"); JA506 ("So the variable of interest here is coupons,

---

[2] That is not true: IOS threatened litigation, not a price war.

so volume is the determinant of price"); JA761 ("Volume is the number one driver here"). Moreover, Grace has never provided any theory as to *how*, exactly, the allegedly anticompetitive agreements allowed CCC and IOS to increase shipping fees; instead, she simply assumed that any supposed "observably higher shipping fees" were attributable to the agreements. JA1718, JA1719.

An analysis that ignores reality cannot meet Plaintiffs' burden of proof, either for class certification or liability. JA601-731 (Kheyfets' Supplemental Expert Report). As Defendants' expert, Michael Kheyfets ("Kheyfets"), demonstrated, even under Grace's analysis, approximately 1,960 manufacturer accounts paid *no shipping fees at all* during the proposed class period, and of those who paid at least some shipping fees, a majority had *no increases* relative to Grace's benchmark period. JA619-620. In sum, *75%* of the 1,942 proposed manufacturer class members that paid two-count shipping fees to CCC showed no injury. Specifically, for *61%* (or 1,181) of them, the shipping fees paid before the alleged class period were statistically indistinguishable from those paid during it, and for another 14% (or 274 of them), those fees statistically *declined*. JA620 n.48.

Similarly, *59%* of the 217 proposed manufacturer class members that paid one-count shipping fees to CCC also showed no injury. Specifically, for 40% (86 of them), the shipping fees paid between the two periods were statistically indistinguishable, and for 19% (or 42 of them), those fees statistically *declined*. JA620 n.48. Finally, *59%* of the 284 proposed manufacturer class members that paid 2-count shipping fees showed no injury either—21% (or 59), paid statistically indistinguishable fees, and another 38% (or 109 of them), paid less statistically. JA620 n.48.

### 3. Plaintiffs' Shifting Class Definitions

#### a. The Court Denies Plaintiffs' First Proposed Class Definitions

Plaintiffs' first class certification motion decided on the merits (filed over a decade after the first complaint) sought to represent two classes: (1) "manufacturers that directly paid observably higher CCC or IOS shipping fees during the class period (April 11, 2011 through March 28, 2007), identified on the list attached to Plaintiffs' supporting brief at Exhibit 24, Appendix A" (the "Original Fixed List Class"); and (b) "retailers that directly paid observably higher CCC or IOS shipping

fees during the class period, identified on the list attached to Plaintiffs' supporting brief at Exhibit 24, Appendix B." JA1249-1250.

In April 2022, the district court denied that motion without prejudice, finding "these classes … impermissible fail-safe classes because class membership is conditioned on having suffered antitrust injury or impact in the form of increased shipping fees." JA1447. As it found, fail-safe classes suffer from two flaws: they "fail to provide the resolution of the claims of all class members … envisioned in class action litigation," JA1446 (cleaned up) (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012)); and they do "not comply with Rule 23's requirement that members of a proposed class be readily identifiable, a principle 'called ascertainability,'" JA1446 (quoting *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 655 (4th Cir. 2019)).

As the court further concluded, both were impermissible fail-safe classes because "antitrust injury" is an element of Plaintiffs' Sherman Act claim, and both provided that "manufacturers or retailers can only be in the proposed classes if they paid observably higher shipping fees—the alleged unlawful impact or purpose of the antitrust conspiracy." JA1447. True, Plaintiffs' expert also listed the manufacturers and

retailers that allegedly suffered antitrust injury, but that did not solve the circularity problem. JA1448.

The problem remained because, "if Plaintiffs fail to prove a particular retailer in the proposed retailer class did in fact pay observably higher shipping fees, then Defendants are entitled to judgment in their favor with respect to that retailer because Plaintiffs failed to prove that retailer suffered antitrust impact or injury." JA1448. But this failure would preclude entering any judgment against that retailer, because it "would no longer fit the class definition." JA1448.

Plaintiffs' definitions were also improper because determining "which retailers and manufacturers paid observably higher fees is not straightforward." JA1448. Certifying either class would require "a preliminary determination that higher fees constitute an injury that will be remedied by a successful verdict in favor of Plaintiffs," which in turn would require resolving "[w]hether higher fees constitute economic loss, and whether that economic loss is proximately caused by unlawful antitrust conduct" even though these are "issues to be determined at trial, not at the class certification stage." JA1448.

Plaintiffs did not petition for review of that order.

> **b.    Plaintiffs Propose More Class Definitions and the Court Certifies a Retailer Class but Not a Manufacturer One**

Plaintiffs again sought class certification, this time for: (1) "manufacturers that directly paid CCC shipping fees during more than 8 different calendar months during the class period (April 11, 2001 through March 28, 2007) and/or were clients of CMS and directly paid shipping fees to IOS for at least 2.2 million coupons during the class period" (the "Limited Payer Class"); and (2) "retailers and retail associations that were CCC customers and directly paid shipping fee chargebacks to CCC of at least $50 during the class period."  JA1452.

After a hearing at which Grace and Kheyfets testified, JA1949-2035, the court invited briefing on whether it "should certify classes without the eight month, 2.2 million coupon, or $50 cutoffs." JA2067.  In response, Plaintiffs proposed yet another set of class definitions: (1) "manufacturers that directly paid CCC shipping fees during the class period and/or were clients of CMS and directly paid shipping fees to IOS" (the "All Payer Class"); and (2) "retailers and retail associations that were CCC customers and directly paid shipping fee chargebacks to CCC during the class period."  JA2067.  Plaintiffs also argued that a twist on the

20

Original Fixed List Class would work with a defined class of the "manufacturers listed in [Appendix] A" (the "Fixed List Class"). JA2097 n.10 (cleaned up).

On August 23, 2023, the court entered a 67-page decision granting in part and denying in part class certification. JA2117-2118.

### (a)    *The Rejected Limited Payer Classes*

The district court rejected those "Limited Payer Classes" as "not ascertainable because their scope is not defined by the Defendants' allegedly conspiratorial activities," JA2117, and because they frustrated a main purpose of class actions: "avoiding multiple lawsuits." JA2074-2075 (quoting *Fariasantos v. Rosenberg & Assocs., LLC*, 303 F.R.D. 272, 278 (E.D. Va. 2014)). In so doing, it emphasized Plaintiffs' concession that "they imposed numerical cutoffs for the classes (8 months, 2.2 million coupons, or $50) because, using [Plaintiffs'] model, the cutoffs provide a natural breaking point above which almost all manufacturers and retailers were injured." JA2073 (cleaned up). After questioning the naturalness of a breaking point that "exclude[s] over 2,000 injured manufacturers and more than half of all injured retailers," JA2073 n.6, the court found the definitions improper because "Plaintiffs' model,

rather than the Defendants' alleged conspiracy, determines which retailers and manufacturers receive the benefits of class membership." Those definitions did not "connect[] ... Defendants' allegedly impermissible activities and the classes Plaintiffs seek to certify," but instead set cutoffs that "arbitrarily exclude" over 2,000 "injured parties from the class."[3]  JA2073-2074.

### (b) The Rejected All Payer Manufacturer and Fixed List Classes and Certified Retailer Class

The court rejected the All Payer Class, but certified the retailer class.  It explained that the proposed "Manufacturer Class fail[ed] the predominance requirement because one-third of the class is uninjured." JA2117.  It found that Plaintiffs presented no evidence that 2,533 out of 7,813 members (32%) suffered any antitrust injury, that this proportion far exceeded what other courts have allowed, and that Plaintiffs "d[id] not claim ... that they can establish a winnowing mechanism" to weed out the uninjured.  JA2089-2090, JA2094.  Moreover, "individualized questions, including those regarding class members' injury, [would]

---

[3] As Kheyfets explained, Grace opined that 5,280 manufacturers were injured by Defendants' conduct, JA611, but the Limited Payer Class includes only 3,219 allegedly injured manufacturers.  JA2072.

overwhelm common ones and render class certification inappropriate."
JA2095 (quoting *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee
Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2022) (en banc)).  The court did,
however, certify the "All Payer Retailer Class" based on Plaintiffs'
evidence that this class "only includes 18 uninjured class members"—a
percentage (6%) that "approaches the 'outer limits of a de minimis
number'" but "could be winnowed from the class without individual
issues subsuming class-wide ones."  JA2112-2113 (quoting *In re Rail
Freight Fuel Surcharge Antitrust Litig.* (*In re Rail Freight II*), 934 F.3d
619, 625 (D.C. Cir. 2019)).

As to the Fixed List Class, the court again held that definition was
essentially unchanged and remained impermissibly fail-safe.  JA2097
n.10.

Plaintiffs subsequently filed a Rule 23(f) petition, this Court
granted review, and this appeal followed.

## SUMMARY OF ARGUMENT

This Court should affirm the district court's decision declining to
certify a manufacturer class.  The fact that Plaintiffs offered many
different definitions does not mean that the district court had to pick any

of them. None of them came close to satisfying Rule 23. Nor should this Court assume Plaintiffs' burden and try to craft a better definition for them. That is because all of Plaintiffs' proposed classes—and indeed *any* manufacturer class—suffer from a common flaw: the predominance of individualized issues, given that what each manufacturer paid depended on individualized circumstances that varied widely among putative class members. This Court need look no further to affirm.

This Court can also affirm because, as the district court correctly found, Plaintiffs' proposed classes suffer from other critical flaws. *First*, the Fixed List Class is impermissibly fail-safe. Defendants need not, and this Court should not, take on faith Plaintiffs' representations that they have done the court's work for it, or agree with their claim that courts cannot scrutinize that work. *Second*, the Limited Payer Class fails both ascertainability and the requirement that a class action be superior to other methods of proceeding. *Third*, the All Payer Class fails to satisfy standing and predominance. Plaintiffs are not entitled to certification for persisting in trying to force a square peg into a round hole. If there was any error here, it is not that the district court failed to certify enough classes, it is that it certified any at all.

24

## STANDARD OF REVIEW

Because district courts retain "broad discretion in deciding whether to allow the maintenance of a class action," *Zimmerman v. Bell*, 800 F.2d 386, 389 (4th Cir. 1986) (quoting *Roman v. ESB, Inc.*, 550 F.2d 1343, 1348 (4th Cir. 1976)), this Court accords decisions to grant or deny class certification "substantial deference." *Gunnels v. Healthplan Servs., Inc.*, 348 F.3d 417, 424, 434 (4th Cir. 2003). A district court abuses its discretion "when it materially misapplies the requirements of Rule 23." *Career Counseling, Inc. v. Amerifactors Fin. Grp., LLC*, __ F.4th __, 2024 WL 220377 (4th Cir. Jan. 22, 2024) (quoting *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014)). This Court reviews factual findings in support of such decisions only for clear error. *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317-18 (4th Cir. 2006). Under clear error review, "facts found by the district court are conclusive on appeal 'unless … plainly wrong.'" *Walton v. Johnson*, 440 F.3d 160, 173 (4th Cir. 2006) (en banc) (quoting *Jiminez v. Mary Wash. Coll.*, 57 F.3d 369, 378-79 (4th Cir. 1995)).

## ARGUMENT

### I. No Manufacturer Class Can Be Certified Because Individual Issues Predominate

Rule 23(b)(3) requires that "[common] questions of law or fact ... predominate over any questions affecting only individual members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 622 (1997) (quoting Fed. R. Civ. P. 23(b)(3)). That requirement is "far more demanding" than the threshold commonality requirement. *Id.* at 624. Accordingly, courts must conduct a "rigorous analysis" of the Rule 23(b)(3) requirements and Plaintiffs' methodology for satisfying them, and find facts in the face of conflicting expert testimony. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 323-24 (3d Cir.), *as amended* (Jan. 16, 2009). For a court to conclude that predominance has been satisfied, a plaintiff must "demonstrate that the element[s] of [the legal claim are] ... capable of proof at trial through evidence that is common to the class rather than individual." *Id.* at 311-12. Plaintiffs cannot do so here.

As Defendants argued below, none of the manufacturer classes Plaintiffs propose can be certified because individual issues predominate. *E.g.*, ECF 158 at 15-17; ECF 282 at 7-9. Although the district court did not deny certification on this ground, this Court is "not limited to

evaluation of the grounds offered by the district court to support its decision, but may affirm on any grounds apparent from the record." *United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005); *Ostrzenski v. Seigel*, 177 F.3d 245, 253 (4th Cir. 1999) (same).

Here, individual issues necessarily predominate for *any* manufacturer class because *manufacturers individually decided* what they would pay for shipping fees. JA1386-1391. Manufacturers had no contractual obligation to pay shipping fees charged by retail processors like CCC or IOS.[4] JA1387. As a result, each manufacturer made its own decision whether to pay all, part, or none of those fees. JA1387. Each manufacturer's decision was based on its own policies which varied widely. JA678-684. And, the retail processer had no recourse against the manufacturer if it decided to pay less than the invoiced shipping fees. JA899.

---

[4] Although retailers may have had contracts with manufacturers, retail processors like CCC and IOS had no role in setting shipping fees charged by retailers under those contracts. JA1387. Moreover, the vast number of written agreements and policies meant that there was little or no uniformity in what companies paid for shipping. JA1390.

In addition, CMS also had agreements with some—but not all—of its manufacturer customers that effectively capped CCC's shipping fees for manufacturers. JA1387.

As a result, there is no uniformity in the shipping fees manufacturers paid CMS or IOS. That lack of uniformity requires individualized injury evidence for every manufacturer, precluding Plaintiffs from establishing predominance for any of Plaintiffs' proposed manufacturer classes. In "every private anti-trust action," plaintiffs must prove not only "a violation of the anti-trust laws," but *also* "individual injury" and damages. *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 65-66 (4th Cir. 1977). "While a case may present a common question of violation, the issues of injury and damage remain the critical issues in such a case and are always strictly individualized." *Id.*

*Windham* affirmed the denial of class certification in an antitrust case because the "multiplicity of claimants who might be involved, the complexity of their claims as they would relate to injury and damages, and the highly individualized character the proof of injury and damages would assume," required "a mini-trial in all the individual claims, probably with a separate jury." *Id.* at 66. In particular, the Court noted

28

the difference between antitrust cases where the fact of injury and damages are "virtually a mechanical task capable of mathematical or formula calculations" and those "where the issue of damages and impact does not lend itself to such a mechanical calculation, but requires separate mini-trials of an overwhelming large number of individual claims." *Id.* at 68 (cleaned up).  The former may be certifiable, the latter is not.  *Id.*  Given the differing and deeply individual decisions about fees, this case clearly falls into that second, uncertifiable bucket.

Although Grace tried to reduce questions of injury and damage to ones subject to common proof and a common answer, she could do so only by assuming price was based only on "volume," and ignoring the varying manufacturer shipping fee policies and agreements with CMS capping shipping fees.  JA477; JA480; JA506; JA616-626; JA761.  Grace's analysis shows that approximately 1,960 manufacturers paid no shipping fees at all during the proposed class period, and a majority of those paying at least some had *no* increases in fees relative to her benchmark period.  JA619-620.  Of the 1,942 proposed manufacturer class members that paid 2-count shipping fees to CCC, 75% either paid the same, or lower fees during the alleged class period as before.  JA620 n.48.

29

Similarly, the fees paid between the two periods were statistically indistinguishable for 40% of the 217 proposed manufacturer class members that paid 1-count shipping fees to CCC, and statistically declined for another 19%. JA620 n.48. Finally, 59% of the 284 proposed manufacturer class members that paid 2-count shipping fees either paid statistically indistinguishable shipping fees, or had statistical declines in those fees. JA620 n.48.

Antitrust cases declining to certify classes on predominance grounds given similar, individualized facts are legion. *E.g., Windham*, 565 F.2d at 72 (affirming denial of certification given market-to-market, day-to-day, and government-grade-to-government-grade price variations); *In re Rail Freight II*, 934 F.3d at 625-27 (affirming denial of certification because plaintiffs' expert found 12.7% of putative class members suffered no injury, thus requiring individualized inquiries to determine who was actually injured); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 58 (1st Cir. 2018) (reversing class certification because individual issues identifying who had not suffered any antitrust injury would predominate); *In re New Motor Vehicles Can. Exp. Antitrust Litig.*, 522 F.3d 6, 29-30 (1st Cir. 2008) (reversing certification because

individual issues predominated based on each proposed class member's price negotiation); *In re Hydrogen Peroxide*, 552 F.3d 305, 325-27 (vacating class certification because plaintiffs' regression analysis (like Grace's) failed to account for differing contract negotiations and terms and substantial price disparities); *Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 424-26 (5th Cir. 2004) (reversing certification because class members' individual negotiations prevented plaintiff from arguing that all suffered an antitrust injury just by paying a fee); *Blades v. Monsanto Co.*, 400 F.3d 562, 574-75 (8th Cir. 2005) (affirming denial of certification because particularized evidence would be required to show the prices some class members paid were a result of antitrust conspiracy).[5]

As in those cases, no class should be certified here. All the classes Plaintiffs propose—and indeed any manufacturer class—cannot satisfy predominance because there is no common proof, or common answer, as to whether, when, what, or why manufacturers paid shipping fees. To

---

[5] Outside of the antitrust context, *see Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 343, 352 (4th Cir. 1998) (reversing certification because franchisees had different contracts at different times and different levels of compensable injury); *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 148-50 (4th Cir. 2001) (reversing certification based on individual issues of applicator and contractor behavior for product installation).

assess antitrust injury therefore would require "separate mini-trials" for each manufacturer to determine each manufacturers' policy, agreement, or practice for paying shipping fees. *Windham*, 565 F.2d at 68-69 (cleaned up). And, to be clear, the "justification of class certification is absent [because] the individual plaintiffs are financially able to prosecute individual actions." *Id.* at 69.

## II. The District Court Did Not Abuse Its Discretion by Declining to Certify Plaintiffs' Fail-Safe Fixed List Class

Plaintiffs contend on appeal that the district court abused its discretion by rejecting their Fixed List Class—defined simply as the 5,280 "manufacturers listed in App[endi]x A" of Grace's report—because it was not a fail-safe class, and that even if it was, this Court should ignore its prior guidance and adopt the minority view upholding such classes. OB 20. Neither argument holds up.

Plaintiffs themselves acknowledge the "problems with fail-safe classes." OB 19. Nevertheless, they argue that—contrary to this and most Circuits' precedent—Rule 23 does not prohibit fail-safe classes. They also assert the Fixed-List Class was not fail-safe because Plaintiffs had reduced their theory to "a list of specified manufacturer purchasers,"

even though it purports to be a list of *injured* manufacturers.  OB 21, 26, 32.  Neither argument salvages their proposed class.

## A.    Rule 23 Prohibits Certifying Fail-Safe Classes

Eight circuits, including this one, have held or acknowledged Rule 23 prohibits fail-safe classes.[6]  Only two have not.  *In re White*, 64 F.4th 302 (D.C. Cir. 2023)—on which Plaintiffs heavily rely—and *In re Rodriguez*, 695 F.3d 360 (5th Cir. 2012), are outliers on the issue.

Consistent with the overwhelming weight of Circuit authority, this Court has recognized that district courts should not certify "fail-safe" classes.  *Adair*, 764 F.3d at 360 n.9.  *Adair* vacated certification because the district court, *inter alia*, "fail[ed] to rigorously analyze whether the administrative burden of identifying class members in the ownership cases would render class proceedings too onerous." *Id.* at 358.  The Court

---

[6]  *Olean,* 31 F.4th at 669 n.14; *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1276-77 (11th Cir. 2019); *Orduno v. Pietrzak*, 932 F.3d 710, 716 (8th Cir. 2019); *Mullins v. Direct Digit., LLC*, 795 F.3d 654, 659-60 (7th Cir. 2015); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 22 (1st Cir. 2015); *Byrd v. Aaron's Inc.*, 784 F.3d 154, 167 (3d Cir.), *as amended* (Apr. 28, 2015); *Adair*, 764 F.3d at 360 n.9; *Randleman v. Fid. Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011) (holding that "an improper fail-safe class … shields the putative class members from receiving an adverse judgment" and "is an independent ground for denying class certification").

noted that "the district court did not address whether it is possible to define the classes without creating a fail-safe class," meaning a class "defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *Id.* at 360 n.9 (cleaned up). Accordingly, this Court directed the district court to "consider this issue as part of its class-definition analysis." *Id.* It would make no sense to give that instruction if this Court believed Rule 23 imposes no limits on fail-safe classes.

Plaintiffs nonetheless contend there is no problem with fail-safe classes that do not violate "the explicit requirements of Rule 23." OB 32. But, as the courts' reasoning in rejecting fail-safe classes makes plain, they *do* violate Rule 23's express requirements. *E.g., Orduno v. Pietrzak*, 932 F.3d 710, 717 (8th Cir. 2019); *Adashunas v. Negley*, 626 F.2d 600, 604 (7th Cir. 1980); *Mullins v. Direct Digit., LLC*, 795 F.3d 654, 660 (7th Cir. 2015). The main defect is that, because membership in a fail-safe class depends on the merits of class members' claims, a fail-safe class "cannot be defined until the case is resolved on its merits." *Young*, 693 F.3d at 538; *see also Orduno*, 932 F.3d at 716 (explaining that fail-safe classes are "defined to preclude membership unless a putative member

34

would prevail on the merits"). That cannot be reconciled with Rule 23(c)'s requirement that courts decide "[a]t an early practical time … whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A). If a court cannot determine whether a putative class member fits the class definition until (or worse yet, after) trial, the court obviously cannot decide whether to certify a class "[a]t an early practical time." *Id.*; *Orduno,* 932 F.3d at 716-17.

Fail-safe classes are also irreconcilable with Rule 23(c)'s requirement that a class judgment, "[w]hether or not favorable to the class," must "include and describe those to whom the court finds to be class members." Fed. R. Civ. P. 23(c)(3)(A). In a fail-safe class, "a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Messner v. Northshore Univ. HealthSys.,* 669 F.3d 802, 825 (7th Cir. 2012) (collecting cases); JA1447-1448 (recognizing same). And if every putative class member loses, there are *no* class members, and thus no class (or class judgment) at all. In a fail-safe class, therefore, a "judgment" can *never* be "not favorable" to those class members. Fed. R. Civ. P. 23(c)(3)(A); *Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n*, 814 F.2d 358, 361-63 (7th Cir. 1987)

(explaining that Rule 23 was amended in 1968 to prevent "one-way intervention"). Simply put, with a fail-safe class, the house always wins: either the class prevails as a whole, or its putative members are not bound by a losing judgment.

That, as Plaintiffs concede, "raises an obvious fairness problem for the defendant: the defendant is forced to defend against the class, but if a plaintiff loses, she drops out and can subject the defendant to another round of litigation." *Mullins,* 795 F.3d at 660; OB 19 (agreeing that one of the "problems with fail-safe classes" is that they "allow putative class members to seek a remedy but not be bound by an adverse" result) (quoting *Orduno*, 932 F.3d at 716-17)). That is even more troubling here, where Plaintiffs seek certification under Rule 23(b)(3) and thus must show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see Nexium*, 777 F.3d at 22 ("In certifying a (b)(3) class there is an almost inevitable tension between excluding all non-injured parties from the defined class and including all injured parties in the defined class."). Here (and with fail-safe classes generally), such a definition leaves unsuccessful putative class members free to file duplicative individual

36

actions. *Id.*; *Orduno*, 932 F.3d at 716-17 (holding a fail-safe class "also unmanageable" under Rule 23(b)(3)(D)). For these reasons, as most Circuits have recognized, fail-safe classes are inherently inconsistent with Rule 23. *E.g.*, *Mullins*, 795 F.3d at 657 ("We and other courts have long recognized an implicit requirement under Rule 23 that a class must be defined clearly and that membership be defined by objective criteria," which is not satisfied "when class membership was defined in terms of success on the merits (so-called 'fail-safe' classes).").

But even if Plaintiffs were correct that Rule 23 does not *categorically* prohibit fail-safe classes, it would not follow that the district court abused its discretion by finding the Fixed List Class is the kind of fail-safe class that Rule 23 *does* forbid. The court held that because the Fixed List Class was defined to include only manufacturers that "paid observably higher shipping fees," it was "defined so that whether a person qualifies as a member … depends on whether the person has a valid claim." JA1447 (quoting *Adair*, 764 F.3d at 360 n.9). And that meant class membership turns on questions like "[w]hether higher fees constitute economic loss, and whether that economic loss is proximately caused by unlawful antitrust conduct"—and those "are issues to be

37

determined at trial ….” JA1448. That also meant the district court would not be able to “enter judgment” against a class member who had failed to prove injury because it “would no longer fit the class definition.” JA1448. Those two problems render the Fixed List Class uncertifiable under Rule 23.

**B.    The Fixed List Class Is Impermissibly Fail-Safe Because Membership Is Conditioned on Having Suffered Antitrust Injury**

Plaintiffs do not seriously dispute that their Original Fixed List Class—defined as manufacturers who “directly paid observably higher CCC or IOS shipping fees during the class period,” JA1249-1250—was a fail-safe class. Instead, they argue that they cured that defect by proposing a class definition that consisted of a list of manufacturers. JA2097 n.10; OB 37. Not so.

As a threshold matter, a class definition that consists solely of a list of putative class members created by class counsel cannot be squared with Rule 23. Under Rule 23, plaintiffs bear the burden of “submit[ting] a proposed class definition,” and courts must then “evaluate the [Rule] 23 requirements and determine whether to certify the proposed class.” *Rivera v. Exeter Fin. Corp.,* 829 F. App’x 887, 887 & n.1 (10th Cir. 2020)

(mem.) (affirming denial of certification where plaintiffs sought to define class as "482 cell phone subscribers" identified in attached list (cleaned up)); Fed. R. Civ. P. 23(c)(1)(B) (requiring courts to "define the class" in certification orders).

"[I]t is insufficient merely to provide a list, however lengthy, of persons said to be in the class and leave it to the court to devise a class definition." 1 McLaughlin on Class Actions § 4:2 (20th ed.). Accordingly, although a plaintiff seeking class certification may submit "a list of names" along with a proposed class definition, "a failure to also define the class" is "fatal to class certification." *Rivera,* 829 F. App'x at 887. And providing such a list does not insulate the proposed definition underlying it from scrutiny.

That is because a "party seeking class certification must affirmatively demonstrate his compliance with" Rule 23. *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011). "Rule 23 does not set forth a mere pleading standard." *Id.* at 350-51. Instead, "[a] party seeking class certification … must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* (emphasis in original). Consistent with that rule, courts cannot take

39

compliance on faith, and plaintiffs must "satisfy [Rule 23] through evidentiary proof." *Comcast Corp. v. Behrend,* 569 U.S. 27, 33 (2013). Submitting "a list of names without a class definition falls short of satisfying this burden." *Rivera*, 829 F. App'x at 888.

Plaintiffs, however, turn those requirements on their head, contending that the district court could not engage in any "additional fact-finding" because "how [they] 'generated the list' is not part of the class definition … and courts examining whether a class is fail-safe [should] look only at the class definition itself, not some other set of criteria." OB 21, 37. Plaintiffs argue that it would not be "appropriate to examine underlying criteria behind how the fixed list was compiled (rather than how the class is explicitly defined)[.]" *Id.* at 21, 26. Not so.

As this Court recognized in *Adair*, to assess whether the moving party has "carried its burden, a district court may need to 'probe behind the pleadings before coming to rest on the certification question.'" 764 F.3d at 357 (quoting *Comcast*, 569 U.S. at 33). Accordingly, the district court was not prohibited from undertaking a "rigorous analysis" to assess whether the proposed class was impermissibly fail-safe by analyzing the expert report on which it was based. To the contrary, it was *required* to

40

do so where, as here, the class definition *expressly references materials from the expert report itself*. Plaintiffs' arguments to the contrary are particularly inappropriate here, where they previously *had* submitted a class definition from which they claimed to derive their list. JA1249-1250. Because that definition was expressly fail-safe, the resulting list is as well. Plaintiffs cannot credibly argue that because they provided the court with the result and not the reasoning, the court had to ignore reality.

Plaintiffs cite no case barring courts from looking behind such a list to assess whether its underlying membership criteria comply with Rule 23, and Defendants are aware of none. Contrary to Plaintiffs' argument, *Adair v. EQT Prod. Co.*, 320 F.R.D. 379, 420 (W.D. Va. 2017), did not uphold a "class definition based partly on [a] list … without inquiring whether a class defined based on the criteria used to create the list would be fail-safe." OB 21. Rather, the court did not need to address that question because "the plaintiff ha[d] not sought classwide treatment" of those classes. *Adair*, 320 F.R.D. at 420. Plaintiffs' reliance on *McKeage v. Bass Pro Outdoor World, L.L.C.*, 2014 WL 12754996, at *1 (W.D. Mo. Oct. 7, 2014), for the proposition that a "specific list of class members

41

didn't create [a] 'fail-safe class …" is equally misplaced.  OB 21.  The "list of class members" there was *entirely separate* from the proposed class definition.  2014 WL 12754996, at *1-2.  Here, the proposed class list and class definition are one and the same.

In any event, any class definition generated from Plaintiffs' list would be defined solely by reference to class members' alleged injury and thus impermissibly fail-safe.  It is undisputed that Plaintiffs "generated the list[] of manufacturers … from Dr. Grace's regressions."  JA2097 n.10.  It is also undisputed that the entire purpose of those regressions was to identify manufacturers who supposedly were injured by Defendants.  Grace's Appendix A purports to identify manufacturers who paid "observably higher shipping fees," JA2097 n.10 (cleaned up), and Grace described those "overcharges" as "damages."  JA1726.  Indeed, Appendix A is labeled "Damages by [Manufacturer]" and lists "Damages Estimates" for each putative class member.  JA1729.  That language disposes of Plaintiffs' argument that their list is not "framed as a legal conclusion" and does not "use legal terms of art."  OB 22 (quoting *Lester v. Pay Car Mining, Inc.*, 2018 WL 2728033, at *5 (S.D.W. Va. June 6, 2018)).

"Damages" *is* a legal term of art.  *In re HomeBanc Mortg. Corp.,* 945 F.3d 801, 812 (3d Cir. 2019).)

As the district court correctly concluded, Plaintiff's list—just like the definition it was derived from—was "conditioned on [members] having suffered antitrust injury or impact in the form of increased shipping fees."  JA2097 n.10 (cleaned up).  The court did not abuse its discretion in declining to certify that fail-safe class.

None of the other cases Plaintiffs cite support, let alone compel, a different outcome because the class definitions in those cases turned on factual events, not legal conclusions.  *E.g., Johnson v. City of Grants Pass*, 72 F.4th 868, 878 (9th Cir.), *as amended on denial of reh'g* (July 5, 2023) ("All involuntarily homeless individuals living in Grants Pass"); *Kamar v. RadioShack Corp.*, 375 F. App'x 734, 735 (9th Cir. 2010) ("All California employees of defendant paid on an hourly basis as nonexempt employees for the period of March 2003 to the present who (a) were instructed to and attended a Saturday store meeting or district office meeting without receiving the full amount of mandated premium pay, or (b) worked a split shift schedule without receiving the full amount of mandated premium pay, or (c) fit into both (a) and (b)."); *Lester*, 2018 WL

2728033, at *4 ("full-time employees" "who were terminated from employment, or subject to a reduction in force" (cleaned up)); *Butela v. Midland Credit Mgmt. Inc.*, 341 F.R.D. 581, 591-92 (W.D. Pa. 2022) ("All Pennsylvania residents" who were sent a letter with certain contents); *Benson v. Enter. Leasing Co. of Orlando, LLC*, 2021 WL 2138781, at *3 (M.D. Fla. May 11, 2021) ("Enterprise employees" who were terminated without cause in specified circumstances); *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 2018 WL 11303199, at *2 (D.S.C. June 20, 2018) ("customers of TD Bank … who were assessed an overdraft fee for an ATM or debit card transaction"); *Geary v. Green Tree Servicing, LLC*, 2017 WL 2608691, at *2 (S.D. Ohio June 16, 2017) ("persons who were sent … one or more letters in the form of the exemplars attached hereto"); *Parish v. Sheriff of Cook Cnty.*, 2016 WL 1270400, at *1 (N.D. Ill. Mar. 31, 2016) ("all persons confined at the Cook County Jail on and after August 3, 2005 who provided notice that he or she had been taking prescription medication for a serious health need and who was not provided with appropriate medication within 24 hours thereafter" (cleaned up)). Those classes bear no resemblance to the Fixed List Class here.

Nor do the classes certified in *Olean*, which were defined based on members having bought the antitrust defendants' products. Although *Olean* stated that a "court may redefine [an] overbroad class to include only those members who can rely on the same body of common evidence to establish the common issue," it then immediately clarified that "[a] court may not, however, create a 'fail-safe' class that is defined to include only those individuals who were injured by the allegedly unlawful conduct." 31 F.4th at 669 n.14. Here, Plaintiffs are not just trying to use "Dr. Grace's regression analysis as [common] evidence of antitrust injury and damages" for class members identified through some other means, OB 26, they seek to *condition* class membership on that alleged injury.[7] That is a quintessential fail-safe class, and the district court was well within its discretion to reject it.

## III. The District Court Did Not Abuse Its Discretion by Denying Certification of the Limited Payer Class

The district court's refusal to certify the Limited Payer Class was also a permissible exercise of its broad discretion. The court correctly

---

[7] That in turn refutes Plaintiffs' arguments that their Fixed List Class somehow avoids the drop-out problem inherent to fail-safe classes. OB 22-23.

45

found that the Limited Payer Class violates Rule 23's "ascertainability" requirement because it defines class membership by reference to arbitrary cutoffs rather than "objective criteria." JA2069-2075. That same defect also prevents the Limited Payer Class from satisfying Rule 23's "superiority" requirement. JA2069 n.3. For either or both reasons, this Court should affirm the district court's decision.

### A. The Limited Payer Class Is Not Ascertainable Based on Objective Criteria

The district court did not abuse its discretion by finding that the Limited Payer Class violates Rule 23's ascertainability requirement. This Court has "repeatedly recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable," also known "as an ascertainability requirement." *Adair*, 764 F.3d at 358 (cleaned up); *accord Krakauer*, 925 F.3d at 654-55. Ascertainability is "an 'essential' element of class certification" "encompassed" by Rule 23, 1 Newberg on Class Actions § 3:2 (6th ed.); *Adair*, 764 F.3d at 358, and a "textually-grounded component of express requirements in Rule 23." 1 McLaughlin on Class Actions § 4:2. Most directly, it follows from Rule 23(c)'s requirement that "[a]n order … certify[ying] a class action must define the class and the class claims,

46

issues, or defenses." Fed. R. Civ. P. 23(c). Because of that requirement, "plaintiff[] must define and establish the existence of an aggrieved class that is ascertainable by reference to objective criteria." 1 McLaughlin on Class Actions § 4:2; *Marcus v. BMW of N. Am., LLC,* 687 F.3d 583, 592-93 (3d Cir. 2012); *Rivera,* 829 F. App'x at 887-88; *Groussman v. Motorola, Inc.,* 2011 WL 5554030, at \*7 (N.D. Ill. Nov. 1, 2011).[8]

Consistent with these principles (and contrary to Plaintiffs' argument that ascertainability should be "narrowly construed" (OB 45)), this Court "requires a *heightened* ascertainability showing before a class is certified." 1 McLaughlin on Class Actions § 4:2 (emphasis added). 829 F. App'x at 887-88; *Groussman,* 2011 WL 5554030, at \*7. Under this Court's precedent, "[a] class cannot be certified unless a court can readily identify the class members *in reference to objective criteria*," *Adair,* 764

---

[8] In addition, courts cannot perform Rule 23's "rigorous analysis," *Comcast*, 569 U.S. at 35 (quoting *Dukes*, 564 U.S. at 350-51), unless absent class members are "readily identifiable." *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972). Without a ready means of ascertaining who belongs in the proposed class, Plaintiffs cannot show that common questions "predominate," or that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

F.3d at 358 (emphasis added), and without individualized inquiries. *Career Counseling,* 2024 WL 220377, at *2.

Those objective criteria require that "the class definition must have some relation to the defendants' conduct" and be derived "from objective records, such as information from a company's records." 1 McLaughlin on Class Actions § 4:2; *see, e.g.*, *All. to End Repression v. Rochford*, 565 F.2d 975, 978 (7th Cir. 1977); *Franco v. Conn. Gen. Life Ins. Co.*, 289 F.R.D. 121, 141 (D.N.J. 2013), *aff'd*, 647 F. App'x 76 (3d Cir. 2016); *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 320 (C.D. Cal. 1998); *cf. Krakauer*, 925 F.3d at 658 (class ascertainable based on "class-wide data" from defendant's "records").[9] This requirement "is rooted in the underlying purposes of the class action device and the dictates of due process," 1 McLaughlin on Class Actions § 4:2, because it "[e]nsures that

---

[9] Plaintiffs deny this requirement, but cite no case rejecting it. Nor does requiring ascertainability risk creating fail-safe classes, as Plaintiffs argue. OB 44. It is "[d]efining the class in terms of the legal *injury*"—as the Fixed List Classes do—that creates a fail-safe class. *Byrd*, 784 F.3d at 167 (emphasis added) (cleaned up). The objectivity requirement requires class definitions tied to defendants' *conduct*, not to class members' *injury*. 1 McLaughlin on Class Actions § 4:2 ("While plaintiffs need not prove that putative class members have been injured for purposes of defining a class, the class definition must have some relation to the defendants' conduct."); *O'Connor*, 184 F.R.D. at 320 (same).

those actually harmed by defendants' wrongful conduct will be the recipients of the relief eventually provided." *Simer v. Rios*, 661 F.2d 655, 670 (7th Cir. 1981); 1 McLaughlin on Class Actions § 4:2 (a class definition must "objectively specify[] a particular group that was harmed during a particular time frame, in a particular location, in a particular way").

Here, the district court reasonably found that the Limited Payer Class fails the ascertainability requirement because it was not defined "in reference to objective criteria." JA2070-2071 (quoting *Adair*, 764 F.3d at 358).[10] Rather than being based on "the defendants' conduct" or "objective records," 1 McLaughlin on Class Actions § 4:2, its definition depends on arbitrary cutoffs—the payment of shipping fees to CCC "during more than 8 different calendar months" or the payment of shipping fees to IOS "for at least 2.2. million coupons"—chosen solely by Plaintiffs' counsel. JA2067, JA2072-2074 (cleaned up). Such "arbitrary"

---

[10] Whether class members have "already [been] identified" (OB 42) is irrelevant if the identification is not based on "objective criteria." *Adair*, 764 F.3d at 358; *see, e.g.*, *Rivera*, 829 F. App'x at 887-88 (submitting a list of class members does not satisfy requirement to objectively define class); 1 McLaughlin on Class Actions § 4:2 ("[I]t is insufficient merely to provide a list, however lengthy, of persons said to be in the class and leave it to the court to devise a class definition.").

cutoffs are not the sort of "objective criteria" from which a class may be defined. *Brooks v. Darling Int'l, Inc.*, 2017 WL 1198542, at *7-8 (E.D. Cal. Mar. 31, 2017); *accord Gbarabe v. Chevron Corp.*, 2017 WL 956628, at *30 (N.D. Cal. Mar. 13, 2017); *Schwartz v. Destination Maternity Corp.*, 2015 WL 13648569, at *1 (C.D. Cal. May 18, 2015); *Elsea v. Jackson Cnty.*, 2010 WL 4386538, at *3 n.3 (W.D. Mo. Oct. 28, 2010), *abrogated on other grounds by Hood v. Gilster-Mary Lee Corp.*, 785 F.3d 263 (8th Cir. 2015); *Brockman v. Barton Brands, Ltd.*, 2007 WL 4162920, at *2-3 (W.D. Ky. Nov. 21, 2007); *Daigle v. Shell Oil Co.*, 133 F.R.D. 600, 602-03 (D. Colo. 1990).

The Limited Payer Class's eight-month and 2.2-million coupon cutoffs are every bit as arbitrary as the class definitions those courts rejected. Although Plaintiffs argue those cutoffs "are correlated with an increased likelihood and magnitude of damages" (OB 48), it is undisputed that the Limited Payer Class's definition excludes *thousands* of manufacturers that Plaintiffs contend were injured. JA2072-2073.[11]

---

[11]  Plaintiffs contend the Limited Payer Class "is limited to direct payers of shipping fees," OB 46, but it is far more limited than that. The All Payer Class also covers only direct payers, but the Limited Payer Class imposes additional, wholly arbitrary cutoffs on the amount of

Plaintiffs' expert concluded that 5,280 manufacturers were injured by Defendants' alleged conduct, more than 2,000 (39%) of whom are excluded by the cutoffs Plaintiffs selected. JA2072-2073.

For purposes of Plaintiffs' theory of the case, those excluded manufacturers "are indistinguishable from the class members." *Elsea*, 2010 WL 4386538, at *3 n.3. That proves the class definition is "untethered" from *Plaintiffs' own* theories and "evidence of harm," *Gbarabe*, 2017 WL 956628, at *30, and instead relies on "artificial construct[s] adopted for purposes unrelated to the claims in the case or the interests of the injured parties." *Elsea*, 2010 WL 4386538, at *3 n.3. Because such a "class definition has no acceptable basis in objective fact," it violates the ascertainability requirement. *Brooks*, 2017 WL 1198542, at *7-8; *see Groussman,* 2011 WL 5554030, at *7 (denying certification of class limited by "arbitrarily chosen dates"); *Brockman*, 2007 WL 4162920, at *2 (rejecting class definition with no "reasonable relationship" to "the defendants' allegedly harmful activities"); *Daigle*,

---

payments. JA2066-2067. The case Plaintiffs cite as certifying a direct-purchaser class, *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 335 (D. Md. 2012), involved no such cutoffs.

133 F.R.D. at 602-03 (rejecting class definition whose "boundaries" lacked "any logical reason relating to the defendants' activities").

This does not, as Plaintiffs argue, impose "a requirement that injured parties cannot be excluded from a class." OB 43. The problem with the Limited Payer Class is not that it is not "the broadest possible class." OB 43-44 (quoting *Bennett v. GoDaddy.com LLC*, 2019 WL 1552911, at *12 (D. Ariz. Apr. 8, 2019)). The problem is that it "*arbitrarily* … exclud[es]" a *substantial* portion of the manufacturers that Plaintiffs claim were injured by Defendants' alleged conduct, to the benefit of class counsel, but not the potential class. *Schwartz,* 2015 WL 13648569, at *1 (emphasis added); Manual Complex Litigation § 21.222 (4th ed.) ("If the definition fails to include a *substantial number* of persons with claims similar to those of the class members, the definition of the class may be questionable." (emphasis added)). It is the *arbitrariness* and *magnitude* of the exclusions, not their mere existence, that violate the ascertainability requirement.

That distinguishes the cases on which Plaintiffs rely. OB 43-44. Those cases hold, at most, that a class need not "include *all* individuals who may have been harmed." *Byrd*, 784 F.3d at 167 (emphasis added);

*see Vaughn v. CSC Credit Servs., Inc.*, 1994 WL 449247, at *3 (N.D. Ill. Mar. 1, 1994) (rejecting argument that plaintiff must "ask for the widest possible class").[12]  When certifying a narrow class will "ensure that the requirements of Rule 23 are best satisfied," of course a district court "*may* choose" that class.  *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 296 (5th Cir. 2001) (emphasis added).  *Bertulli*, for example, found that a district court did not "abuse [its] discretion" by approving a class definition that excluded "pilots with interests antagonistic to each other," which "ensured that the class maintained a degree of cohesion, a commonality of interest, that a broader class may have lacked."  *Id.*

---

[12]  Indeed, *Vaughn* was a magistrate judge decision that the district court "disagree[d] in part with" on review.  *Vaughn v. CSC Credit Servs., Inc.*, 1995 WL 51402, at *1 (N.D. Ill. Feb. 3, 1995).  Specifically, the district court rejected the magistrate judge's "observation" that the class was defined based on an "irrelevant" limitation, holding that the "limit[ation]" was "appropriate" and that the broader class the defendants requested was not.  *Id.* at *4-5.  *Vaughn* thus does not hold that a plaintiff may arbitrarily limit a class based on legally irrelevant cutoffs.  Neither does *Mace v. Van Rue Credit Corp.*, 109 F.3d 338, 340-42 (7th Cir. 1997), help Plaintiffs here:  it held only that the Fair Debt Collection Practices Act does not require all FDCPA classes to be nationwide.  *Wenig v. Messerli & Kramer P.A.*, 2013 WL 1176062, at *6 (D. Minn. Mar. 21, 2013) (distinguishing *Mace* and denying certification of class defined by "highly artificial limitations").

53

The district court's decision here does not create a broad rule that conflicts with those cases. It did not require that Plaintiffs' class include *all* allegedly injured manufacturers, and Plaintiffs' narrow class definition does not cure problems, it creates them. The district court held only that, in the specific circumstances here, Plaintiffs may not *arbitrarily* exclude *thousands* of allegedly injured manufacturers that are identical to the proposed class members in every relevant way. *Wenig*, 2013 WL 1176062, at *6 (recognizing that rejecting class defined by "highly artificial limitations" is "not to say that a proposed class must always include all possible class members"). That holding was a permissible exercise of the court's discretion under Rule 23.

## B.    The Limited Payer Class Is Not Superior to Other Methods of Adjudication

For the same reasons, the district court permissibly concluded that the Limited Payer Class is not "superior to other methods for the fair and efficient adjudication of the controversy," as Rule 23(b)(3) requires. *Lienhart v. Dryvit Sys., Inc.,* 255 F.3d 138, 147 (4th Cir. 2001) (quoting Fed. R. Civ. P. 23(b)(3)); JA2069 n.3; 1 McLaughlin on Class Actions § 4:2 (explaining that ascertainability "overlaps with the 'manageability' inquiry of Rule 23(b)(3)(D), in which a court assesses whether a class

action is superior to other available methods of fairly and efficiently adjudicating the controversy").  Because the proposed Limited Payer Class arbitrarily excludes a "substantial number" of manufacturers "with claims similar to those of the class members," it cannot satisfy the superiority requirement because it does not "capture[] all members necessary for efficient and fair resolution of common questions of fact and law in a single proceeding."  Manual Complex Litigation § 21.222; *see, e.g.*, *Fariasantos*, 303 F.R.D. at 277-78 (denying class certification under superiority requirement where proposed class arbitrarily excluded numerous injured parties); *Wenig*, 2013 WL 1176062, at *6 (same); *Guevarra v. Progressive Fin. Servs., Inc.*, 497 F. Supp. 2d 1090, 1091 (N.D. Cal. 2007) (same); *Campos v. W. Dental Servs., Inc.*, 404 F. Supp. 2d 1164, 1173 (N.D. Cal. Nov. 28, 2005) (same).

Allowing Plaintiffs to proceed with a class that excludes the "2,000-plus" manufacturers that paid shipping fees to CCC for fewer than eight different calendar months or paid shipping fees to IOS for fewer than 2.2. million coupons "would be counter to one of the main purposes of class actions—avoiding multiple lawsuits."  *Fariasantos*, 303 F.R.D. at 278.  Even though Plaintiffs argue each of those excluded manufacturers

suffered the same injury from the same conduct as class members, they would not benefit from or be bound by a judgment here. Instead, they would either "have to bring individual lawsuits … or their claims would go unprosecuted." *Id.*; *see Campos*, 404 F. Supp. 2d at 1172 (denying certification of class that arbitrarily excluded numerous injured individuals because they "would need to bring their own lawsuits," which "contradicts one of the main purposes of class actions: avoiding multiple lawsuits"). Simply put, "a class action that resolves only a fraction of the possible claims" based on arbitrary cutoffs "is neither a fair nor efficient way to adjudicate the controversy." *Wenig*, 2013 WL 1176062, at *6 (cleaned up).

Here too, Plaintiffs' arguments miss the mark. They try to distinguish *Fariasantos* on the ground that the district court certified a broader class rather than the improper narrow class (OB 46), but the *defendant* moved for certification of that broader class, which satisfied Rule 23. 303 F.R.D. at 277-78. Here, Plaintiffs have the burden to proffer an appropriate class definition, and despite multiple bites at the apple, they still have not done so. *Infra* at Section IV. In such circumstances, courts simply deny certification of the arbitrarily narrow class. *Campos*,

404 F. Supp. 2d at 1173 (denying certification of arbitrarily narrow class because it was "not 'superior' to other means available"); *Guevarra*, 497 F. Supp. 2d at 1091 ("The court denied plaintiff's certification motion, citing plaintiff's arbitrary distinction … and concluding that plaintiff's proposed definition is not 'superior' to other means available …."). Plaintiffs argue in the alternative that *Fariasantos* does not apply in cases without a "statutory damages cap," OB 46, but in such cases, "allowing [Plaintiffs] to define a small class would only *increase* the likelihood of multiple lawsuits." *Campos*, 404 F. Supp. 2d at 1173 (emphasis added).

Moreover, Plaintiffs cannot challenge the court's decision rejecting arbitrary class definitions here by citing decisions approving *non-arbitrary* ones. OB 48-49; *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 62 (S.D. Ohio 1991) (class definition not overbroad because evidence supported claim that all class members were injured); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 143, 145 (D. Md. 2022) (adopting class limitation that excluded *only* non-injured members, for which defendants did "not contest ascertainability on objective criteria grounds"); *In re Zetia (Ezetimibe) Antitrust Litig.*, 2021 WL

3704727, at *3 (E.D. Va. Aug. 20, 2021) (class definition not overbroad because it did not "include so many uninjured class members as to bar class certification"); *Abdeljalil v. Gen. Elec. Cap. Corp.*, 306 F.R.D. 303, 307-08 (S.D. Cal. 2015) (class definition *not* underinclusive); *Dennis v. Saks & Co.*, 1975 WL 909, at *6-7 (S.D.N.Y. July 10, 1975) (imposing limitation required "to make the class manageable" and ensure that "each member of the class … will receive individual notice").[13]

Here, the district court reasonably found that the Limited Payer Class's cutoffs were arbitrary, not supported by the facts, and inconsistent with Rule 23.  It thus did not abuse its discretion by declining to certify that class.

## IV. The District Court Did Not Abuse Its Discretion by Declining to Certify Plaintiffs' All Payer Class

Plaintiffs' last stab at class certification was to go big, proposing that the court simply certify *all* the manufacturers.  That everything-

---

[13]    Plaintiffs misrepresent *Henderson v. Corelogic National Background Data, LLC*, 2016 WL 4611571 (E.D. Va. Sept. 2, 2016), which did not approve *any* class definition.  It *denied* certification of an "overly broad" class and simply ordered additional discovery related to proposed subclasses.  *Id.* at *1-2, *9; *Henderson v. Corelogic Nat'l Background Data, LLC*, 2016 WL 4611570, at *2 (E.D. Va. Sept. 2, 2016) (denying certification of subclasses without prejudice and certification of nationwide class with prejudice).

and-the-kitchen-sink approach cannot be squared with Article III or Rule 23.

Although Plaintiffs never mention standing in their brief, Article III always requires that a plaintiff's injury be "concrete"—that is, "real, and not abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016), *as revised* (May 24, 2016) (cleaned up). The class action device does not dilute, let alone do away with that requirement: to the contrary, every class member must have Article III standing to recover individual damages. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). Although *TransUnion* left open the question whether every class member must demonstrate standing before a court certifies a class, *id.* at 424 n.4, "[f]ollowing *TransUnion*, it is clear that, to recover damages …, '[e]very class member must have Article III standing' 'for each claim that they press,' requiring proof that they 'suffered concrete harm' from the challenged conduct." *Alig v. Rocket Mortg., LLC*, 52 F.4th 167, 168 (4th Cir. 2022) (per curiam) (quoting *TransUnion*, 594 U.S. at 431-32); *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C. J., concurring) ("Article III does not give federal courts the power to order

59

relief to any uninjured plaintiff, class action or not.").[14]  As the party

invoking federal jurisdiction, Plaintiffs bear the burden of establishing

standing.  *Spokeo*, 578 U.S. at 338.  And "[w]hether absent class members

can establish standing may be exceedingly relevant to the class

certification analysis required by Rule 23"—and in particular, the

question of predominance under Rule 23(b)(3).  *Cordoba*, 942 F.3d at

1273.

The All Payer Class cannot be certified consistent with Article III

or Rule 23 because, as the district court explained, "one-third of the [All-

Payer] class is uninjured."  JA2089-2090, JA2094-2095, JA2117.  The

court found as a matter of fact that Plaintiffs presented no evidence of

antitrust injury for 2,533 (32%) of the class's 7,813 members, which far

exceeds the proportion of uninjured members other courts have allowed.

JA2089-2090, JA2094-2095.  Nor did Plaintiffs "claim … they can

establish a winnowing mechanism" to weed out uninjured members.

---

[14] Although the district court did not rule based on Article III, as noted
above, this Court can affirm on any basis supported by the record.

JA2089-2090, JA2094-2095.    That means Plaintiffs' proposed class definition fails under Article III and Rule 23.[15]

The All Payer Class's huge proportion of uninjured class members means that individualized questions of injury will necessarily overwhelm any common questions.  Plaintiffs nevertheless contend that the district court abused its discretion by (a) finding that 2,533 All Payer Class members were uninjured; (b) purportedly applying "a *per se* rule against uninjured class members"; and (c) concluding that individualized issues will predominate.  OB 50.  None of those arguments come close to warranting reversal.

## A.    The District Court Did Not Clearly Err as to the Number of Uninjured Class Members

Faced with the district court's factual findings as to the number of uninjured class members, Plaintiffs implicitly concede that the All Payer Class does contain uninjured members, but quibble with the court's

---

[15]    In addition to establishing Article III standing, private antitrust plaintiffs "must also demonstrate 'antitrust standing.'"  *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 310 (4th Cir. 2007).  Antitrust standing "often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof."  *In re Hydrogen Peroxide*, 552 F.3d at 311-12; *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 238 (4th Cir. 2021).  That is certainly true here.

finding that *a third* of those class members were uninjured. To be clear, Plaintiffs do not take issue with the court's math, just with its significance. Plaintiffs acknowledge that Grace found no *observable* harm for those 2,533 class members, but contend that this is not the same as no actual harm, even though they cannot prove that harm.

That turns class certification on its head. Under blackletter law, Plaintiffs bear the burden of proving both injury and damages, *Adair*, 764 F.3d at 358 (citing *Dukes*, 564 U.S. at 351), but Plaintiffs' formulation would flip that by presuming injury unless Defendants can *disprove* it. No case supports such a departure from controlling case law. Even *In re Polyester Staple Antitrust Litigation*, 2007 WL 2111380, at *19 (W.D.N.C. July 19, 2007), which Plaintiffs cite for the proposition that harm can be presumed, acknowledged the need for "common proof [that] adequately demonstrates some *damage to each individual*." (Cleaned up).

The Ninth Circuit's decision in *Olean* does not salvage Plaintiffs' arguments either. As the district court here acknowledged, *Olean* deemed the fact that one model did not affirmatively show damages for 5.5% of the class unimportant in part because the plaintiffs' expert provided other empirical evidence demonstrating antitrust impact and

damages for each direct purchaser. Here, by contrast, "Plaintiffs lack expert testimony showing impact and damages to almost a third of the class," JA2089-2090, JA2094-2095, JA2104, and "ask[ed] this court" to either fill in the evidentiary gaps for them or simply give them a hall pass. *Olean* does not endorse Plaintiffs' abdication of their responsibility to prove that they can satisfy Rule 23.[16]

Nor, for that matter, do the facts. Plaintiffs' own expert let the cat out of the proverbial bag. As the district court found, she never stated that she could prove all manufacturers were injured. JA2099. To the contrary, she conceded that she "cannot observe the harm." JA1979. Based on that concession, the district court correctly found that absent proof of injury for a third of the proposed All Payer Class, there was in

---

[16] As this Court recognized, "[w]hile a[n antitrust] case may present a common question of violation, the issues of injury and damage remain the critical issues in such a case and *are always strictly individualized.*" *Windham*, 565 F.2d at 66 (emphasis added). *Windham* also undercuts Plaintiffs' argument that the median price increase can be used as a proxy for injury. Even Grace conceded that averages should not be used to calculate impact to manufacturers. JA1715. Plaintiffs cannot explain why a median price increase can be used where averages cannot. As Grace made clear in her report, based on her regressions, "not all manufacturers paid observably higher shipping fees after Defendants' entered the Non-Compete Agreements with IOS." JA1718.

fact no demonstrable injury to those class members. That factual finding was not error, let alone clear error.

## B. The District Court Applied the Correct Legal Standard

Plaintiffs also argue that the district court purportedly applied a per se rule against including uninjured class members. That is false and Plaintiffs cannot make it true through repetition. The court did not hold that the presence of *any* uninjured member in a class necessarily dooms certification. Instead, it held, based on the record before it, that a class with 32% uninjured members far exceeds the "outer limits" allowing a de minimis number of uninjured class members. *In re Rail Freight II*, 934 F.3d at 625. Indeed, as the court also found, Plaintiffs did not argue that 2,533 was "a de minimis number of manufacturers or that they can establish a winnowing mechanism." JA2094. That fact- and case-specific analysis, which carefully walked through all the evidence Plaintiffs relied on, cannot credibly be characterized as a per se rule.

## C. Individualized Issues Predominate.

Finally, for all the reasons set forth above and in the district court's order, individualized issues necessarily prevail over common ones in the All Payer Class. As *Olean* acknowledged, the "district court is in the best position to determine whether individualized questions, including those

regarding class members' injury, 'will overwhelm common ones and render class certification inappropriate under Rule 23(b)(3).'" 31 F.4th at 669 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014)).  Plaintiffs have not proposed any winnowing mechanism, let alone a reasonable one.  Nor for that matter have they advanced a single case certifying another class with no evidence of injury for over 32% of its members.  This Court should affirm the decision below.

## V.     This Court Should Decline Plaintiffs' Invitation to Do Their Job for Them

Plaintiffs suggest that if this Court does not allow one of their proposed classes to go forward, it should craft its own definition that can. "[D]efining the class from scratch is not the district court's job." *Rivera*, 829 F. App'x at 887-88.  It is not this Court's either.  Plaintiffs have had 15 years and multiple tries to come up with a manufacturer class that can satisfy Rule 23.  Their repeated inability to do so does not shift the burden to this Court to try to succeed where they have repeatedly failed.

## CONCLUSION

For the reasons set forth above, this Court should affirm the decision declining to certify a manufacturers class.

## LOCAL RULE 34(a) STATEMENT

Pursuant to Local Rule 34(a), Defendants-Appellees respectfully request oral argument.

Respectfully submitted,

/s/ Lisa R. Bugni

| | |
|---|---|
| Samuel B. Hartzell | Lisa R. Bugni |
| Pressly McAuley Millen | Matthew V.H. Noller |
| WOMBLE BOND | KING & SPALDING LLP |
| DICKINSON (US) LLP | 50 California Street, Suite 3300 |
| 555 Fayetteville Street | San Francisco, CA 94111 |
| Suite 1100 | (415) 318-1200 |
| Raleigh, NC 27601 | lbugni@kslaw.com |
| (919) 755-2112 | |

Anne M. Voigts
KING & SPALDING LLP
601 South California Avenue
Suite 100
Palo Alto, CA 94304
(650) 422-6700

Mateo de la Torre
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
(212) 556-2100

*Counsel for Defendants-Appellees*

January 26, 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), because it contains 12,991 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 365 ProPlus.

Date: January 26, 2024

*/s/ Lisa R. Bugni*

Lisa R. Bugni

*Counsel for Defendants-Appellees*